```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
XTI AEROSPACE, INC.,                                          :
                                                              :
                              Petitioner,                     :    1:24-cv-6590-GHW
                                                              :
              -v-                                             :    MEMORANDUM OPINION &
                                                              :             ORDER
CHARDAN CAPITAL MARKETS LLC,                                  :
                                                              :
                              Respondent.                     :
                                                              :
------------------------------------------------------------- X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/17/2025

GREGORY H. WOODS, United States District Judge:

## I.     INTRODUCTION

Respondent Chardan Capital Markets LLC ("Respondent" or "Chardan") and non-party XTI Aircraft Company ("XTI Aircraft") entered into an agreement to engage Respondent to assist XTI Aircraft with a potential public offering or business combination. This agreement contained an arbitration provision. XTI Aircraft went on to merge with a subsidiary of Petitioner XTI Aerospace, Inc. (formerly known as Inpixon). Following the merger, Respondent initiated an arbitration action against XTI Aircraft and Petitioner, which is now proceeding before the Financial Industry Regulatory Association ("FINRA"). Petitioner moved this Court to stay the arbitration as to Petitioner, arguing that Petitioner was not bound by the arbitration provision. Because Petitioner was neither a party to the agreement between Respondent and XTI Aircraft nor otherwise bound by the agreement under the principle of equitable estoppel, the Court GRANTS Petitioner's motion.

## II.    BACKGROUND

### A. Facts[1]

#### 1. Respondent and XTI Aircraft Entered into an Engagement Agreement

On or about June 7, 2022, Respondent and XTI Aircraft entered into an agreement engaging Respondent's services for a potential initial public offering or merger involving XTI Aircraft. Dkt. No. 25-1 (the "Engagement Agreement"); *see also* Dkt. No. 24 (Petitioner's Statement of Undisputed Facts, or "PSUF") ¶¶ 1, 3. The Engagement Agreement provided that the agreement was "duly authorized, executed and delivered by and on behalf of the Company[2] and Chardan." Engagement Agreement § 12(b).[3] It further provided that "[t]his [Engagement] Agreement shall inure to the benefit of and be binding upon the successors, assigns and personal representatives of each of the parties hereto." *Id.* No other entity was listed as a party to or beneficiary of the Engagement Agreement. The Engagement Agreement was signed by George Kaufman on behalf of Respondent and Robert LaBelle, Chief Executive Officer of XTI Aircraft, on behalf of XTI Aircraft. *Id.* at 9. Petitioner did not sign the Engagement Agreement. *See id.*; PSUF ¶ 11.

The Engagement Agreement provided that Respondent would "act as lead underwriter, financial advisor, sole bookrunner and investment banker in connection with [a] proposed initial public offering" or "as exclusive Merger and Acquisition Advisor and as a Capital Markets Advisor for alternative transactions . . . that might involve a merger or other business combination." Engagement Agreement at 1. The Engagement Agreement also entitled Respondent to certain

---

[1] Unless otherwise indicated, the facts in this section are undisputed.
[2] The Engagement Agreement defined the "Company" as "XTI Aircraft Company (together with its affiliates, successors and assigns)." Engagement Agreement at 1.
[3] Section 12(b) of the Engagement Agreement contained an integration provision, which stated:

> This Agreement embodies the entire agreement and understanding between the Company and Chardan and supersedes any and all negotiations, prior discussions and preliminary and prior agreements and understandings that Chardan may have had with the Company related to the subject matter hereof, and may be modified only by a written instrument duly executed by each party.

2

compensation under specified conditions. Engagement Agreement § 2. Specifically, it required that XTI Aircraft pay Respondent an "M&A Fee" in the event XTI Aircraft consummated a business combination. Engagement Agreement § 2(b). Additionally, "the M&A Fee . . . shall be reduced by 25%" if the merger involves "Inpixon, Global Crossing Airlines, Global Air Mobility, and/or Xeriant."[4] *Id.*

The Engagement Agreement also contained an arbitration provision that stated, in relevant part:

> Any and all disputes, controversies or claims arising out of or relating to this Agreement, or the breach, termination or invalidity thereof, shall be finally and exclusively resolved by arbitration in accordance with the Rules of FINRA as at present in force. The arbitration shall take place in New York City, the State of New York. The parties hereby submit themselves to the exclusive jurisdiction of the arbitration tribunal in the City of New York, the State of New York under the auspices of FINRA.

Engagement Agreement § 12(c). The Engagement Agreement provided that New York law would govern the "validity, interpretation, construction, [and] effect" of the Engagement Agreement. *Id.*

## 2. XTI Aircraft Merged with a Subsidiary of Petitioner

On or about July 24, 2023, XTI Aircraft agreed to merge with Superfly Merger Sub Inc. ("Merger Sub"), a Delaware corporation and a wholly owned subsidiary of Petitioner. Dkt. No. 27-2 (the "Merger Agreement"). Petitioner was a party to the Merger Agreement, *id.*, but did not merge into XTI Aircraft, PSUF ¶ 9.

Section 8 outlined the "conditions precedent" for the consummation of the transactions contemplated by the Merger Agreement. One of the conditions precedent stated:

> The obligations of [Petitioner] and Merger Sub to effect the Merger are also subject to the satisfaction or waiver at or prior to the Effective Time of the following conditions: . . . (i) [XTI Aircraft] and Chardan Capital Markets LLC (or its applicable Affiliate) shall have amended their fee agreement in form and substance reasonably acceptable to [Petitioner].

---

[4] This is the only mention of Petitioner in the Engagement Agreement.

3

Merger Agreement § 8.2(i).

The merger closed on or about March 12, 2024. Dkt. No. 29 (Respondent's Response to PSUF and Supplemental Statement of Undisputed Facts, or "RSUF") ¶ 18. Pursuant to the Merger Agreement, XTI Aircraft merged with Merger Sub, and XTI Aircraft was the surviving corporation. *Id.* ¶ 30. The surviving company, XTI Aircraft, is now a subsidiary of Petitioner. PSUF ¶ 13. After the merger closed, Petitioner amended its articles of incorporation to change its name from Inpixon to XTI Aerospace, Inc. RSUF ¶ 42.

### 3. The Engagement Agreement Was Amended

On or about March 12, 2024, Respondent and XTI Aircraft amended the Engagement Agreement. Dkt. No. 25-2 (the "Amendment"). The only entities named as parties to the Amendment are Respondent and XTI Aircraft. *Id.* at 1 ("Chardan and XTI [Aircraft] are entering into this letter agreement . . . to amend the [Engagement] Agreement."). The only signatories to the Amendment were Scott Pomeroy on behalf of XTI Aircraft and George Kaufman on behalf of Respondent. *Id.* at 3 ("Please confirm your agreement with the foregoing by signing and returning to us your countersigned copy of this Agreement."). Petitioner did not sign the Amendment. *See id.*

The Amendment modified section 2 of the Engagement Agreement and thereby Respondent's potential compensation "[i]f the Inpixon Transaction is consummated." Amendment at 1. The Amendment provided that

> (a) subject to subsection (b) below, Chardan's entire fee under the [Engagement] Agreement will consist of (i) cash in the amount of $200,000 and (ii) the number of shares of XTI [Aircraft] that following conversion at the Exchange Ratio (as described in the S-4), will result in One Million U.S. Dollars (U.S. $1,000,000.00) worth of common shares of the Inpixon entity ("XTI Aerospace") that is publicly listed as a result of the closing of the Inpixon Transaction ("Unadjusted XTIA Shares"). The calculation of the number of Unadjusted XTIA Shares to be received by Chardan is set forth on Exhibit A.
>
> (b) If within ninety (90) days after the Closing of the Inpixon Transaction, XTI Aerospace consummates an offering (whether registered or not) involving, including, or convertible at any time into common stock of securities in which the

4

> price per share of XTIA common stock is less than the per share price of Inpixon stock utilized to calculate the number of Unadjusted XTIA Shares (a "Qualifying Public Offering"), XTI Aerospace will, subject to applicable Securities laws, issue to Chardan additional shares of its common stock calculated as follows ("Additional Shares") . . . .

Amendment at 1–2. The Amendment made no other relevant changes to the Engagement Agreement. In particular, the Amendment did not change the arbitration provision or the definitions of the parties to the Engagement Agreement. *See* Amendment at 3 ("All other provisions of the Agreement remain in full force and effect.").

### 4. Procedural History

Respondent commenced an arbitration action against XTI Aircraft and Petitioner on August 1, 2024 before FINRA (the "Arbitration"). PSUF ¶ 21. Petitioner "has not participated in the Arbitration, except to advise FINRA that it objects to its inclusion in the Arbitration and that it is not bound, and thus does not intend, to participate in the Arbitration." *Id.* ¶ 22.

Petitioner commenced this action on August 30, 2024. Dkt. No. 1. On October 23, 2024, Petitioner filed a motion to stay the Arbitration as to Petitioner, Dkt. No. 23, a Rule 56.1 Statement, Dkt. No. 24, and a memorandum of law in support of the motion, Dkt. No. 26. On November 20, 2024, Respondent filed a response to Petitioner's statement of undisputed facts, a supplemental statement of undisputed facts, Dkt. No. 29, and a memorandum of law in opposition to the motion, Dkt. No. 30 ("Opposition"). Petitioner filed response to Respondent's supplemental statement of undisputed facts, Dkt. No. 33, and a reply memorandum of law, Dkt. No. 31, on December 4, 2024.

On January 6, 2025, the parties informed the Court that they had "reached a settlement in principle," Dkt. No. 34, and the Court issued an order conditionally discontinuing this action without prejudice and without costs, provided that within thirty days Petitioner may apply for restoration of the action to the active docket in the event that the settlement is not consummated, Dkt. No. 35. By letter dated January 13, 2025, Petitioner informed the Court that the parties were

"no longer in agreement to move forward with the settlement terms," and Petitioner requested that this case be restored to the active docket and that the Court proceed to decide Petitioner's motion to stay arbitration. Dkt. No. 36. The Court granted Petitioner's application and reopened the case on January 13, 2025. Dkt. No. 37.

### III. LEGAL STANDARD

#### A. Rule 56 Summary Judgment Standard

"[T]he summary judgment standard is appropriate in cases where the District Court is required to determine arbitrability, regardless of whether the relief sought is an order to compel arbitration or to prevent arbitration." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)) (emphasis omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, and he or she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*,

6

247 F.3d 423, 428 (2d Cir. 2001) (quotation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quotation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quotation omitted).

Still, "[t]he possibility that a material issue of fact may exist does not suffice to defeat the motion; upon being confronted with a motion for summary judgment the party opposing it must set forth arguments or facts to indicate that a genuine issue—not merely one that is colorable—of material fact is present." *Gibson v. Am. Broad. Cos.*, 892 F.2d 1128, 1132 (2d Cir. 1989).

### B. Petition to Stay Arbitration

Under Section 2 of the FAA, as a general matter, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." 9 U.S.C. § 2. "There are two types of validity challenges under § 2: 'One type challenges specifically the validity of the agreement to arbitrate,' and '[t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid.'" *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006)). "[O]nly the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable." *Id.* "[A] party's challenge to another provision of the contract, or to the contract as a whole, does not

7

prevent a court from enforcing a specific agreement to arbitrate. As a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Id.* at 70–71 (internal quotation marks and citation omitted).

"It has long been settled that arbitration is a matter of contract and that, therefore, a party cannot be compelled to arbitrate issues that a party has not agreed to arbitrate." *Isaacs v. OCE Bus. Services, Inc.*, 968 F. Supp. 2d 564, 567 (S.D.N.Y. 2013). "The question of whether the parties have agreed to arbitrate, *i.e.*, the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (citation omitted) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). "This principle flows inexorably from the fact that arbitration is simply a matter of contract between the parties." *Id.* (quotation and brackets omitted); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (holding that "arbitration is a matter of contract" (quotation omitted)); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (holding that, with respect to an arbitration agreement, "as with any other contract, the parties' intentions control" (quotation omitted)). Hence, "[t]he threshold question of whether the parties indeed agreed to arbitrate is determined by state contract law principles." *Nicosia*, 834 F.3d at 229 (citation omitted).

However, "[t]he Supreme Court has interpreted the FAA broadly, finding a 'liberal federal policy favoring arbitration agreements.'" *Bynum v. Maplebear Inc.*, 160 F. Supp. 3d 527, 533 (E.D.N.Y. 2016) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)) (brackets omitted). Furthermore, "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25.

"[T]he party resisting arbitration bears the burden of proving that the claims at issue are

8

unsuitable for arbitration." *Green Tree Fin. Corp. Alabama v. Randolph*, 531 U.S. 79, 91 (2000) (citations omitted); *see also Application of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342–43 (S.D.N.Y. 2014) ("Whether it argues that arbitration is improper because the arbitration agreement is invalid under a defense to contract formation, or asserts that the arbitration contract does not encompass the claims at issue, either way, the resisting party shoulders the burden of proving its defense." (quotation omitted)). If the Court determines "that an arbitration agreement is valid and the claim before it is arbitrable, it must stay or dismiss further judicial proceedings and order the parties to arbitrate." *Patterson v. Raymours Furniture Co.*, 96 F. Supp. 3d 71, 75 (S.D.N.Y. 2015) (quotation omitted).

## IV. DISCUSSION

### A. Petitioner Is Not Bound by the Arbitration Provision

Petitioner did not agree to be bound by the Engagement Agreement and therefore is not bound by the Engagement Agreement's arbitration provision. Petitioner was neither a party to the Engagement Agreement nor a party to the Amendment. PSUF ¶¶ 1, 5. Petitioner was not named in Section 12(b) of the Engagement Agreement, which listed the parties who "duly authorized, executed, and delivered" the agreement. The Engagement Agreement "embodied the entire agreement and understanding" only "between [XTI Aircraft] and Chardan." Engagement Agreement § 12(b). Likewise, the Amendment stated that only "Chardan and XTI [Aircraft] are entering into this letter agreement." Amendment at 1.

Further, Petitioner did not sign either the Engagement Agreement or the Amendment. And Respondent has not offered any evidence that either the Engagement Agreement or the Amendment was signed by Petitioner's agent, that Petitioner was assigned the contract, or that Petitioner was an alter ego of the parties. *See Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 390 (S.D.N.Y. 2019) (stating that under "New York contract law, it is axiomatic that a

9

contract cannot bind a non-party unless the contract was signed by the party's agent, the contract was assigned to the party, or the signatory is in fact the 'alter ego' of the party"). At the time the contracts were executed, the merger had not yet been consummated. *See* Amendment at 1 ("If the Inpixon Transaction is consummated, Section 2 of the Agreement is amended . . . ."). There are therefore no facts showing that XTI Aircraft, a legally distinct entity at the time of the agreement, could bind Petitioner to the Engagement Agreement's provisions.

Nor is Petitioner bound under the theory of equitable estoppel. "Under the estoppel theory, a company knowingly exploiting an agreement with an arbitration clause can be estopped from avoiding arbitration despite having never signed the agreement." *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 61 (2d Cir. 2001) (quotations and brackets omitted). "[T]he nonsignatory beneficiary must actually invoke the contract to obtain its benefit, or the contract must expressly provide the beneficiary with a benefit." *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 68 (2d Cir. 2021) (quoting *Trina Solar US, Inc. v. Jasmin Solar Pty Ltd*, 954 F.3d 567, 572 (2d Cir. 2020)). "It is not enough for the nonsignatory to rely on an independent business relationship rather than the agreement itself." *Trina Solar*, 954 F.3d at 572. "The benefits of exploiting the agreement, however, must flow *directly* from the agreement, rather than indirectly from the contractual relation of the parties to the agreement." *Id.* (cleaned up) (emphasis in original).

Any benefit conferred to Petitioner in the Engagement Agreement was at most indirect. Respondent contends that XTI Aircraft was incentivized to merge with Petitioner because of the M&A Fee discount. *See* Engagement Agreement § 2(b). However, on this record, Petitioner did not invoke the discount provision, and at base, the discount is a direct benefit to XTI Aircraft, not Petitioner. Any second-order incentive to merge with Petitioner flows "indirectly from the contractual relation" that Respondent and XTI Aircraft created. *Trina Solar*, 954 F.3d at 572. The incentive is thus "incidental to the contract's execution" and therefore an "indirect" benefit to

10

Petitioner.  *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270, 276 (S.D.N.Y. 2011).  *Cf. USHealth Group, Inc. v. South*, 636 Fed. App'x 194, 201 (5th Cir. 2015) (holding that a parent company was not bound by employment agreements entered into by a subsidiary even though those agreements "hoped to incentivize high performance" for the parent company—an "indirect benefit").

Respondent also argues that the Amendment's terms conferred a direct benefit to Petitioner. Opposition at 8.  The facts before the Court show no such benefit.  The Amendment changed the calculation of Respondent's fee, entitling Respondent to $200,000 cash and a number of shares of XTI Aircraft that would convert to $1 million worth of Petitioner's shares.  Amendment at 1.  Further, the Amendment states that given certain conditions, Petitioner will issue additional shares to Respondent.  *Id.* at 2.  Again, Petitioner did not sign the Amendment, and there is nothing in the record to show that Petitioner agreed to assume this obligation.  In any case, there are no facts showing that this amendment to the fee provision confers any benefit to Petitioner.  Even if one infers that Petitioner found the amended terms "reasonably acceptable" because of the condition in the Merger Agreement § 8.2(i),[5] this is not evidence that Petitioner received a direct benefit.

Respondent also argues that Petitioner "actively participated in negotiating the Amendment," Opposition at 9, but Respondent does not offer any facts that show that Petitioner did participate in negotiating the Amendment.  Even if "various individuals who would go on to serve as officers of Petitioner [] actively participated in negotiating the Amendment," Opposition at 9, that does not mean that those individuals, who were officers of XTI Aircraft at the time, *see* RSUF ¶ 39, were acting as agents of Petitioner or otherwise serving Petitioner's interests.  In any event, Respondent fails to provide any case law stating that active participation in negotiations confers a direct benefit or otherwise necessitates the application of equitable estoppel.

---

[5] There is no other evidence in the record to show that Petitioner did in fact approve these terms.

11

### B. Appropriate Relief

The Court grants Petitioner's request for a declaratory judgment that Petitioner is not bound by the Engagement Agreement's arbitration provision. Pursuant to the Declaratory Judgment Act, a district court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). A district court should entertain the request for a declaratory judgment if either "the judgment will serve a useful purpose in clarifying and settling the legal relations at issue" or "it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 96 (2d Cir. 2023). The parties here dispute whether Petitioner is bound by the Engagement Agreement's arbitration provision, and this issue is necessary to determine whether Petitioner can be compelled to arbitrate before FINRA. A declaratory judgment on this matter will therefore clarify a legal relationship and afford Petitioner relief from uncertainty as to the propriety of its engagement in the Arbitration. Therefore, the Court finds it appropriate to enter a declaratory judgment. *See Deutsche Bank Securities Inc. v. Roskos*, No. 15-CV-534 (LTS), 2016 WL 9446863, at *3 (S.D.N.Y. Aug. 4, 2016), *aff'd*, 692 Fed. App'x 52 (2d Cir. 2017) ("Given that [d]efendants have initiated a FINRA arbitration proceeding against the [plaintiffs], declaratory relief is appropriate in order to clarify the parties' respective rights to pursue, or have terminated, the arbitration.").

The Court further grants a permanent injunction. "To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Roskos*, 2016 WL 9446863, at *5 (quoting *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006)). As explained above, Petitioner succeeds on the merits of its claim. And Petitioner "would be irreparably harmed by being forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable." *Maryland Cas. Co. v. Realty Advisory Bd. on Lab. Rel.*, 107 F.3d 979, 985 (2d Cir. 1997). *See also Roskos*,

2016 WL 9446863, at *5 (permanently enjoining the defendants from pursuing their claims in FINRA arbitration). Therefore, the Court permanently enjoins Respondent from pursuing its claims against Petitioner in the Arbitration.

## V. CONCLUSION

For the foregoing reasons, Petitioner is not bound by the arbitration provision in the Engagement Agreement, and Respondent is hereby enjoined from pursing its claims against Petitioner in the pending Arbitration before FINRA. The Clerk of Court is directed to enter judgment for Petitioner and to close this case.

SO ORDERED.

Dated: January 17, 2025
New York, New York

_____
GREGORY H. WOODS
United States District Judge

13